**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **INTEGRITY CARPET CLEANING, INC.** | : | |
| **d/b/a LEATHER PRO,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 08-4127** |
| | : | |
| **THE BULLEN COMPANIES,** | : | |
| **Defendant** | : | |

**M E M O R A N D U M**

STENGEL, J.                                                January  5,  2011

This breach of contract action was originally filed in the Circuit Court of Jackson

County, Missouri and was then removed by the defendant to the United States District

Court for the Western District of Missouri.  Upon joint motion of the parties, it was

transferred to this court in August of 2008.  Discovery was completed in March of 2010

and the defendant filed a motion for summary judgment.  For the following reasons, I will

grant the motion in part and deny it in part.

I.     **BACKGROUND**[1]

Plaintiff, Integrity Carpet Cleaning d/b/a Leather Pro, is in the business of

marketing and selling leather cleaning products and teaching about the process of

cleaning leather.  Pl.'s Resp. To Def.'s Statement of Material Facts ("Pl.'s SF") ¶ 1.  In

---

[1]  The following background is adopted from the Concise Statements of Material Fact
filed by the plaintiff and defendant and from the evidence of record.  In accordance with the
summary judgment standard, all inferences are drawn in favor of the plaintiff as the non-moving
party.

2006, Leather Pro hired The Bullen Companies to engineer, manufacture, and bottle custom leather cleaning and maintenance products. Def.'s Statement of Material Facts ("Def.'s SF") ¶ 3. Leather Pro provided samples of products it wanted Bullen to create, and instructed Bullen that it sought "mirror images" of the samples provided, but which performed better, were water-based, and smelled like leather. Pl.'s SF ¶ 6. Later in 2006, Leather Pro contracted to sell Bullen's products to a third party, Stanley Steemer, for use in "Leather Cleaning Kits." Def.'s SF ¶ 4. Stanley Steemer had precise requirements for the chemical makeup of the products, and communicated these requirements to Leather Pro. Pl.'s SF, ¶ 8. For a period of several months, Bullen sent samples of the products to Leather Pro for field testing. Id. at ¶ 9. Lonnie McDonald, Leather Pro's President, testified that the field testing encompassed only testing for whether the products met basic use requirements, i.e. whether the products cleaned, repelled water, or repelled oil. Dep. Of Lonnie McDonald 18:18–19:18. He specifically stated that he relied on Bullen to create a chemical formula meeting the requirements set forth by Stanley Steemer. Pl.'s SF ¶ 9.

Leather Pro ultimately placed orders for five separate products for use in the Stanley Steemer kits: (1) Nubuck Protection PA; (2) Leather Protector PA; (3) Moisturizer PA; (4) Deep Cleaner; and (5) Aniline Cleaner. Pl.'s SF ¶ 10. Most of these products were sent directly from Bullen to Stanley Steemer, and they were packaged under a Stanley Steemer label by Bullen. Id.; Compl. ¶ 18. After several months during

which Stanley Steemer distributed the kits to its employees and franchisees and relied on Leather Pro to train these individuals in using the products, it discovered that batches of the two cleaning products had been polluted with toilet bowl cleaner and mislabeled. Pl.'s SF ¶ 11; Dep. Of An Vu, 13–15. Over the next several months, the cleaning products were recalled, packaged at Stanley Steemer Stores, and sent back to Bullen. Id. ¶¶ 12, 14; Def.'s SF ¶ 14. Bullen then produced and sent to Stanley Steemer replacement cleaning products. Def.'s SF ¶ 15. Leather Pro claims the contamination of the cleaners caused Stanley Steemer to investigate the remaining Bullen-produced products. Pl.'s SF ¶¶12, 15. As a result of this testing, Stanley Steemer discovered problems with the two protection products: the poor viscosity of the Leather Protector PA product caused it to separate over a period of time and create an unpleasant smell, and caps on the bottles containing it weren't properly sealed, and the Nubuck Protection PA was highly flammable and contained a high solvent content. Pl.'s SF ¶¶ 17, 19. Because Stanley Steemer rejected the Bullen-produced protection products, Leather Pro provided replacement protection solutions to Stanley Steemer from another vendor, Multi-Master North America. Id. ¶ 16; Def.'s SF ¶ 37.

According to Leather Pro, the contamination of the cleaning products occurred several months after its production agreement with Bullen was underway, and its field testing of the protection products did not reveal any problems. Pl.'s SF ¶¶ 22, 23, 25. It claims that while it was generally aware of the basic uses of the products, it was unaware

of the specific chemical makeup of the products, including the degree of solvent in the Nubuck Protection PA, which caused its flammability. Pl.'s SF ¶¶ 28, 30, 32. While Bullen claims the two protection products were recalled because Stanley Steemer believed they were not the same products it initially approved, Leather Pro disputes this, arguing that the products were recalled solely because they malfunctioned and were hazardous. Def.'s SF ¶¶ 34-36; Pl's SF ¶¶ 34-36. At some point after the recall of the Bullen products, Stanley Steemer terminated its relationship with Leather Pro. Def.'s SF ¶ 38.

Leather Pro's complaint against Bullen consists of four counts: Count I alleges breach of the implied warranty of merchantability; Count II alleges breach of the implied warranty of fitness for a particular purpose; Count III alleges negligence; and Count IV alleges breach of contract. Leather Pro is a corporation organized under the laws of Missouri with its principal place of business in Missouri, and Bullen is a corporation organized under the laws of Pennsylvania with its principal place of business in Pennsylvania. Both parties agree that the amount in controversy exceeds $75,000. Therefore, this court may properly exercise jurisdiction under 28 U.S.C. § 1332(a). Bullen now seeks partial summary judgment in its favor on the following five grounds: (1) the economic loss rule precludes Leather Pro from recovering under a negligence theory; (2) Leather Pro cannot prove reliance and is therefore barred from asserting claims under the implied warranty of fitness for a particular purpose; (3) Leather Pro

cannot prove that the protection products performed improperly or were otherwise defective and therefore cannot claim breach of the implied warranty of merchantability for these products; (4) Leather Pro cannot prevail on its breach of contract claim for the protection products because it tested, approved, and accepted them; and (5) Leather Pro's claim for incidental and consequential damages is precluded because it is too speculative.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is "genuine" when a reasonable jury could return a verdict for the non-moving party based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" when it could affect the outcome of the case under the governing law.  Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the

non-moving party's case." <u>Celotex</u>, 477 U.S. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing "based on the affidavits or by depositions and admissions on file" that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322; <u>Harter v. GAF Corp.</u>, 967 F.2d 846, 852 (3d Cir.1992).

## III.   DISCUSSION

The parties are in agreement that Pennsylvania substantive law applies to this dispute.[2]

---

[2]   In a diversity case, a federal court "must apply the choice of law rules of the forum state to determine what substantive law will govern." <u>Huber v. Taylor</u>, 469 F.3d 67, 73 (3d Cir. 2006) (citing <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). A choice of law question only arises if there is a conflict between potentially applicable bodies of law. <u>Id.</u> at 74. Bullen claims that since this case involves the sale of goods, and both Pennsylvania and Missouri have adopted the Uniform Commercial Code, there is no conflict. Def.'s Mem. In Support of Mot. For Summary J., 6. Leather Pro agrees and points out that, even under the second prong of Pennsylvania's choice of law analysis, which uses the "significant relationship" test to determine which state has a stronger interest in the outcome of the conflict, Pennsylvania law would apply because Pennsylvania is the state where the defendant is located, where the products at issue were manufactured, and where the forum is located. Pl.'s Resp. To Def.'s Mot. For Summ. J. (Pl.'s Resp.), 5 (citing <u>LeJeune v. Bliss-Salem, Inc.</u>, 85 F.3d 1069, 1071 (3d Cir. 1996)).

**A.      Plaintiff's Negligence Claims**

It is clear that the buyer of a defective product has remedies against the seller under the U.C.C., which Pennsylvania has adopted.  See Aloe Coal Co. v. Clark Equip., 816 F.2d 110, 116 (3d Cir. 1987).  Bullen claims that Leather Pro's negligence claim, which it has asserted in addition to contract and warranty claims, must be dismissed because the economic loss rule, which bars recovery in tort for economic losses caused by defective products, applies.  Pennsylvania's economic loss rule "provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage." Azur v. Chase Bank USA, 601 F.3d 212, 222 (3d Cir. 2010).  Stated differently, "a manufacturer in a commercial relationship has no duty under either negligence or strict products-liability theory to prevent a product from injuring itself." Aloe Coal, 816 F.2d at 117 (citing East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871, 106 S.Ct. 2295 (1986).  Leather Pro responds that Bilt-Rite Contractors, Inc. v. The Architectural Studio, 866 A.2d 270, 581 Pa. 454 (Pa. 2005), applies in this case and renders the economic loss rule inapplicable.

 In Bilt-Rite, the Supreme Court of Pennsylvania addressed whether the economic loss rule applies to a building contractor who asserted a negligent misrepresentation claim under Section 552 of the Restatement (Second) of Torts against an architect after it relied on the architect's misrepresentations in submitting a contract bid.  Id. at 272.  The court recognized that lower courts in Pennsylvania and District Courts interpreting

Pennsylvania law had applied the rule to prevent contractors and subcontractors from recovering in tort for the negligent misrepresentations of architects and other design professionals on the ground that tort law "is not intended to compensate parties for losses suffered as [a] result of a breach of duties assumed only by agreement." Id. at 283 (citing Palco Linings, Inc. v. Pavex, Inc., 755 F.Supp. 1269, 1271 (M.D.Pa. 1990) (holding that "the policy consideration underlying tort law is the protection of persons and property from losses resulting from injury . . . a buyer, contractor, or subcontractor's 'desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects.'" (internal citations omitted))).

In rejecting the reasoning of Palco and other courts to so construe the economic loss rule, however, the court's decision in Bilt-Rite was narrow:

> We are persuaded by . . . decisions from our sister jurisdictions that: (1) this Court should formally adopt Section 552 of the Restatement (Second), which we have cited with approval in the past, as applied by those jurisdictions in the architect/contractor scenario; (2) there is no requirement of privity in order to recover under Section 552; and (3) the economic loss rule does not bar recovery in such a case. Recognizing such a cause of action, with such contours, is consistent with Pennsylvania's traditional common law formulation of the tort of negligent misrepresentation.

Id. at 285. The court's intention that its decision apply only to architects, engineers, and other professionals who supply specific and unique information for use by others in their business dealings is evident from the cases it cited supporting its ruling, all of which involve negligent misrepresentations by architects and engineers who submitted plans and

-8-

calculations for use by others in bidding on construction or other projects.  See id. at 284-

288, citing, inter alia, Nota Constr. Corp. v. Keyes Assoc., 45 Mass.App.Ct. 15, 694

N.E.2d 401 (Mass. 1998) (subcontractor relied architect's plans in bidding on school

construction project); Donnelly Constr. Co. v. Oberg/Hunt/Gilleland, 139 Ariz. 184, 677

P.2d 1292 (Ariz. 1984) (same); Robert & Co. Assoc. v. Rhodes-Haverty P'ship, 250 Ga.

680, 300 S.E.2d 503 (Ga. 1983) (property buyers relied on engineer's report concerning

the condition of property); Jim's Excavating Serv., Inc. v. HKM Assoc., 265 Mont. 494,

878 P.2d 248 (Mont. 1994) (construction project bidder relied on engineer's plans and

preparations for a project); Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones,

& Goulding, Inc., 320 S.C. 49, 463 S.E.2d 85 (S.C. 1985) (same)).

The Supreme Court of Pennsylvania and federal courts in this circuit have

recognized the limited holding of Bilt-Rite.  Court have refused to apply it to plaintiffs

asserting general negligence claims against retailers, see Pa. State Emp. Credit Union v.

Fifth Third Bank, 398 F. Supp. 2d 317, 327-28 (M.D.Pa. 2005); credit-card issuers, see

Azur, 601 F.3d at 223-24; and utility companies, see Excavation Techn., Inc. v. Columbia

Gas Co. Of Pa., 985 A.2d 840, 604 Pa. 50 (Pa. 2009), because they are not design

professionals hired to prepare plans or provide information to others for pecuniary gain.

At least one of these courts has also noted that Bilt-Rite is inapplicable where a plaintiff

asserts a general negligence and not a negligent misrepresentation claim.  See Fifth Third

Bank, 398 F. Supp. 2d at 328 ("[T]he instant case is not a negligent misrepresentation

case, and <u>Bilt-Rite</u> was not an expansive examination of the economic loss doctrine[.]").

Leather Pro's reliance on <u>Bilt-Rite</u> is inapposite.  First, it asserts a negligence claim against Bullen, not a negligent misrepresentation claim.  Second, its argument that Bullen, as a chemical manufacturer, should be held to the standards of design professionals like architects and engineers, is shallow.  Leather Pro claims Bullen is a design professional because it was hired to chemically analyze and copy formulas, and then to manufacture Leather Pro's line of products.  Even assuming this is true, Leather Pro can point to no case from the Supreme Court of Pennsylvania or elsewhere supporting the claim that a chemical manufacturer provides information any more than a seller of other goods does.  The Pennsylvania Supreme Court expressly limited its holding in <u>Bilt-Rite</u> to apply to design professionals, and did not include generic manufacturers, even those involved in sophisticated work.

Leather Pro's reliance on <u>Saratoga Fishing Co. v. J.M. Martinac & Co.</u>, 520 U.S. 875, 117 S.Ct. 1783 (1997) is similarly unavailing, as that case concerns the interpretation of general maritime law, and does not purport to construe Pennsylvania law.  <u>See</u> <u>Travelers Indem. Co. v. Dammann & Co., Inc.</u>, 594 F.3d 238, 252 (3d Cir. 2010) (rejecting reliance on <u>Saratoga Fishing</u> because, as a maritime matter, it did not construe New Jersey law, the controlling law in the case).

<u>Bilt-Rite</u>'s exception to the economic loss rule does not apply in this case.  A review of the record reveals that the harm Leather Pro claims to have suffered is indeed

economic in nature.[3]  Its complaint alleges that, as a result of Bullen's failure to deliver

usable products to Stanley Steemer, Stanley Steemer had to recall the Bullen products,

Leather Pro was forced to purchase significant quantities of leather care products from

another manufacturer, and ultimately Stanley Steemer ceased its business relationship

with Leather Pro.  In other words, Bullen's failure to meet its obligations to supply a

working product caused Leather Pro to incur financial damages and to lose a business

relationship with a third party.  I believe this action sounds in contract, and that Leather

Pro has failed to establish that an exception to the economic loss rule — which limits tort

liability to damages caused by harm to persons or property — applies.  Therefore, I will

grant Bullen's motion for summary judgment on this claim and dismiss Count IV of

Leather Pro's complaint.

### B.    Plaintiff's Claim for Breach of the Implied Warranty of Fitness for a Particular Purpose

Bullen argues that Count II of Leather Pro's complaint, alleging breach of the

implied warranty of fitness for a particular purpose, must be dismissed because Leather

Pro has failed to show that it relied on Bullen's skill to select or furnish goods suitable for

---

[3] I note that defendant failed to raise what may be a more appropriate argument: that the gist of the action doctrine, closely related to the economic loss doctrine, applies in this case and bars Leather Pro's negligence claim.  The gist of the action doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." Duquesne Light Co v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995).  While both the gist of the action doctrine and the economic loss rule therefore apply to preclude plaintiffs from asserting what are essential contract-based claims in a tort action, the economic loss rule has its origin in the preclusion of products liability contract-based claims.  In any case, because I believe Leather Pro's tort claim should be barred, I will not address this distinction further.

its contract with Stanley Steemer.  The parties agree that 13 PA. CONS. STAT. ANN. §

2315, codifying Article 2, Section 315 of the Uniform Commercial Code, applies to this

claim.  It states:

> § 2315 Implied warranty: fitness for particular purpose
>
> Where the seller at the time of contracting has reason to know:
> (1) any particular purpose for which the goods are required; and
> (2) that the buyer is relying on the skill or judgment of the seller to
> select or furnish suitable goods;
> there is unless excluded or modified under section 2316 (relating to
> exclusion or modification of warranties) an implied warranty that the
> goods shall be fit for such purpose.

13 PA. CONS. STAT. ANN. § 2315 (2010).[4]  Bullen argues that Leather Pro "did not rely on

the 'skill or judgment' of Bullen for the approval of the products in question."  Def.'s

Mem., 12.  This claim is belied by the evidence in the record, which indicates

unequivocally that Leather Pro relied on Bullen to create, manufacture, and design

products suitable for cleaning and protecting leather.  The only case cited by Bullen in

support of its argument that a product made for a unique client with specific requirements

does *not* support a claim for breach of the implied warranty of fitness for a particular

---

[4]  As noted in Comment 2 to Section 2315:

> A "particular purpose" differs from the "ordinary purpose" for which the goods
> are used in that it envisages a specific use by the buyer which is peculiar to the
> nature of his business whereas the ordinary purposes for which goods are used are
> those envisaged in the concept of merchantability and go to uses which are
> customarily made of the goods in question. For example, shoes are generally used
> for the purpose of walking upon ordinary gound, but a seller may know that a
> particular pair was selected to be used for climbing mountains.

Comment 2, 13 PA. CONS. STAT. ANN. § 2315.

purpose is <u>Gall by Gall v. Allegheny County Health Dept.</u>, 555 A.2d 786, 521 Pa. 68 (Pa. 1989), in which the Supreme Court of Pennsylvania rejected a claim asserted under Section 2315 by a plaintiff who became ill after the defendant failed to properly treat municipal tap water.  The court rejected the claim on the ground that "[t]he sale of water for drinking and household use does not carry with it the implied warranty of fitness for a particular purpose[.]"  <u>Id.</u> at 790.  The facts here are starkly in contrast.  Leather Pro's President, Lonnie McDonald, testified that Leather Pro relied on Bullen's expertise in developing chemical formulas and manufacturing chemicals when it contracted with Bullen to create custom leather cleaning products:

> Q: When you first started working with Bullen to develop this product line, where were the . . . formulations coming from?  Is that supplied by Leather Pro; was that something created by - -
> A: We're not chemists; we don't have formulas; we don't own formulas.  We sent them copies of products that we thought were the best products on the market; that we had used for years and said: This is what we want.  We want it to be a mirror-image of this.  We want it to be water-based and smell like leather.  And they then asked us for the MSDS sheets on those products - - material safety data sheets  - - which we also sent them.

McDonald Dep., 17:23–18:14.  Bullen's former national sales manager, Mark Warner, testified that Leather Pro's business relationship with Bullen came about in part because Mr. Warner told Mr. McDonald that Bullen had the capability to "put together private label products . . . from floor finish to cleaners to all kinds of products."  Deposition of Mark Warner, 52:15–18, 53:22–25.

Bullen presents no evidence to contradict that put forth by Leather Pro, which

establishes that Leather Pro relied on Bullen's skill and judgment to furnish products suitable for use in leather cleaning kits. I will deny Bullen's motion for summary judgment on Count II of Leather Pro's complaint.

### C. Plaintiff's Claim for Breach of the Implied Warranty of Merchantability

Bullen asserts that "Plaintiff's claim for breach of the implied warranty of merchantability must be struck because Plaintiff does not make a showing that the product was defective." Def.'s Mem., 13. However, this section of Bullen's brief addresses only the fitness of the protection products ("Here, there is no evidence that the protection products malfunctioned."), and does not assert that Leather Pro's merchantability claim should fail with regard to the cleaning products, which were mixed with toilet bowl cleaner when delivered to Stanley Steemer.

Bullen claims there is no evidence it breached either an express or an implied warranty, citing 13 PA. CONS. STAT. ANN. § 2313,[5] the provision of the U.C.C. dealing with express warranties, for the assertion that "any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model." 13 PA. CONS. STAT. ANN. § 2313(a)(3). Bullen appears to argue that an express warranty was created when it sent Leather Pro samples of the protection products, and that because the final version of the products sent to Stanley

---

[5] Bullen actually cites sections of "Pa.S.C.A." throughout its brief although Pennsylvania's annotated code is properly cited as "PA. CONS. STAT. ANN." or "Pa.C.S.A."

Steemer did not vary from those samples, the express warranty was not violated.  Leather Pro did not assert an express warranty claim.

However, Count I of Leather Pro's complaint specifically asserts a breach of the implied warranty of merchantability.  To be merchantable, goods must be "fit for the ordinary purposes for which such goods are used[.]" 13 PA. CONS. STAT. ANN. § 2314. The implied warranty of merchantability "arise[s] by operation of law and serve[s] to protect buyers from loss where the goods purchased are below commercial standards or are unfit for the buyer's purpose."  Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d 1102, 1105 (3d Cir. 1992).  To establish a breach of the implied warranty of merchantability, "plaintiffs must show that the equipment they purchased from defendant was defective."  Id.  This requires showing "(1) that the product malfunctioned; (2) that [the plaintiff] used the product as intended or reasonably expected by the manufacturer; and (3) the absence of other reasonable secondary causes."  Id.

It appears Bullen does not dispute either that the contaminated cleaning products were defective or that Bullen breached the implied warranty of merchantability with respect to the cleaning products.  The issue here is therefore whether Leather Pro has proffered sufficient evidence of defectiveness of the protection products to survive Bullen's motion.  Leather Pro argues the Leather Protection PA was defective because its components separated in the bottle and would not go back into a single solution and because the bottle caps did not work properly.  It claims the Nubuck protection product

was defective because "it was mostly solvent-based (as opposed to water-based, which rendered it highly hazardous and flammable)." Pl.'s Resp., 17–18.

In support of this claim, Leather Pro presents the testimony of An Vu, a purchasing agent for Stanley Steemer, who averred that the Nubuck protector's formulation was changed and that, because an email from Mr. McDonald to a chemist at Stanley Steemer was never received, Stanley Steemer was not made aware of the change in formulation and therefore was unable to determine whether the product "worked well or not." See Vu Dep., 24:1–24. However, a formula change in a product does not, in itself, make that product defective. Leather Pro also relies on the testimony of Mr. McDonald, who explained that, with respect to the Protection PA, (1) "when it set, it separated and then it would not go back into solution," (2) "when it separated out, it created a much stronger smell than when it was in solution," and (3) the seals of the caps on the bottles of solution were breaking. McDonald Dep., 42:10–11; 42:16–18; 48:11–15. With respect to the Nubuck protector, he explained that, pursuant to the agreement, all Bullen-created products were to "be water-based and smell like leather." McDonald Dep. 43:2–3. However, the Nubuck protector "was 100 percent solvent. Not one or two percent. It was completely solvent. And I don't remember whether they said it was combustible or flammable, but it was the worst of the two, and they couldn't use it because it was combustible or flammable." Id. at 43:19–25.

Mr. McDonald's testimony is sufficient to create an issue of fact whether the

protection products, like the cleaning products, were defective. It could allow a trier of

fact to conclude that the Leather Protection PA was defective because it would not return

to a solution form required for use and because the bottles containing it had defective

caps and that the Nubuck protector was defective because it was highly flammable or

combustible and therefore dangerous. Therefore, Bullen's motion for summary judgment

on Leather Pro's claim for breach of the implied warranty of merchantability on all four

products — the two cleaning products containing toilet bowl cleaner, and the two

protection products — will be denied.

### D.    Plaintiff's Breach of Contract Claim

Bullen claims that, with regard to the protection products, Leather Pro's breach of

contract claim must also fail. It cites, in support of what appears to be a statute of frauds

argument, 13 PA. CONS. STAT. ANN. § 2107(a), which concerns the sale of minerals,

including oil or gas. Because minerals are not the subject of the agreement in this case,

Section 2107 is not applicable. Rather, as pointed out by Leather Pro, if Bullen is

attempting to make a Statute of Frauds argument, it is Section 2204 of the code which

applies. It provides:

> (a) General rule.--Except as otherwise provided in this section a
> contract for the sale of goods for the price of $500 or more is not
> enforceable by way of action or defense unless there is some writing
> sufficient to indicate that a contract for sale has been made between the
> parties and signed by the party against whom enforcement is sought or
> by his authorized agent or broker.
>  . . .
> (c) Enforceability of contracts not satisfying general requirements.--A

contract which does not satisfy the requirements of subsection (a) but which is valid in other respects is enforceable:

> (1) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the business of the seller and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement;
>
> (2) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or
>
> (3) with respect to goods for which payment has been made and accepted or which have been received and accepted.

13 Pa. Consol. Stat. Ann. § 2201. Leather Pro claims that all three subsections of Section 2201(c) apply to its agreement with Bullen. It claims the agreement meets the requirements of subsection 1 because the products were specially manufactured for Leather Pro for use in the Stanley Steemer leather cleaning kits and were therefore not suitable for sale to others. It claims subsection 2 is applicable because Mr. Warner, Bullen's former national sales manager, testified that Bullen and Leather Pro had an agreement. Finally, it argues that subsection 3 is applicable because both parties are in agreement that Bullen produced and shipped its cleaning products pursuant to the agreement with Leather Pro, and received payment for the goods, months before Stanley Steemer discovered problems. Bullen appears to concede this, stating that "the agreement between Leather Pro and Bullen likely falls within the exception of [Section 2201(c)]."

Assuming, therefore, that a valid oral contract existed between Leather Pro and

Bullen, the issue Bullen presents is whether Leather Pro has offered evidence creating an issue of fact whether a breach occurred. Bullen's argument on this point consists of one sentence: "Bullen provided protection products which had 'nuclear' performance, and were approved after full, fair, and adequate opportunity to test by Leather Pro." Def.'s Mem., 15. Leather Pro has presented evidence that its oral contract with Bullen obligated Bullen to produce leather cleaning and protection products suitable for use in leather cleaning kits, that neither the cleaning products nor the protection products were usable, and that Stanley Steemer recalled the Bullen-produced cleaning products *and* the protection products as a result. In general, when a seller provides goods pursuant to the contract that fail to conform to the contract, that buyer may reject those goods, and is entitled to remedies. See 13 PA. CONS. STAT. ANN. § 2601. "Goods or conduct including any part of a performance are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract." Id. at § 2106(b). Leather Pro has presented evidence sufficient for a trier of fact to conclude that the goods tendered by Bullen were not in accordance with its obligations under the valid oral contract, and therefore, summary judgment on this count will be denied.

### E.  Plaintiff's Claim for Incidental and Consequential Damages

Finally, Bullen argues Leather Pro's statements supporting its incidental and consequential damages claims are "overly remote" and seeks a ruling from the court that such damages may not be awarded. In Pennsylvania, both incidental and consequential

damages are recoverable for breach of contract.  See 13 PA. CONS. STAT. ANN. § 2714.

The following provisions apply:

> (a) Incidental damages.--Incidental damages resulting from the breach of the seller include:
>> (1) expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected;
>> (2) any commercially reasonable charges, expenses or commissions in connection with effecting cover; and
>> (3) any other reasonable expense incident to the delay or other breach.
> (b) Consequential damages.--Consequential damages resulting from the breach of the seller include:
>> (1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
>> (2) injury to person or property proximately resulting from any breach of warranty.

13 PA. CONS. STAT. ANN. § 2715.  "Lost profits are recoverable as consequential damages . . . where a seller knows or has reason to know that a buyer is purchasing a good for resale.  The award of such damages, however, pits the plaintiff's right to the bargain of his contract against the need to prevent jury verdicts based on speculation rather than proper proof."  Nat'l Controls Corp. v. Nat'l Semiconductor Corp., 833 F.2d 491, 495 (3d Cir. 1987) (internal citations and quotations omitted).  "[L]ost profits are recoverable when they are 'lost on a particular sale or contract for the performance of which the goods in question were purchased.'"  Id. (citing Neville Chem. Co. v. Union Carbide Corp., 422 F.2d 1205, 1226 (3d Cir. 1970), cert. denied, 400 U.S. 826, 91 S.Ct. 51 (1970)).

The plaintiff has the burden of proof on a claim for lost profits. Brisbin v. Superior Valve Co., 398 F.3d 279, 289 (3d Cir. 2005). Damages for lost profits may be recovered "if (1) there is . . . evidence to establish the damages with reasonable certainty, (2) the damages were the proximate consequence of the wrong, and (3) the damages were reasonably foreseeable." Id. (citing Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 680 (3d Cir. 1991)); see also The Birth Center v. The St. Paul Companies, Inc., 787 A.2d 376, 388 n. 15, 567 Pa. 386 (Pa. 2001). To establish that damages were foreseeable, the buyer need not show that the seller "contemplate[d] the particular damages or tacitly agree[d] to assume liability for such damages; a plaintiff only needs to show that the damages were 'reasonably foreseeable at the time the agreement was entered into.'" Philips Bros. Elec. Contractors, Inc. v. Solomon Corp., No. 96-694, 1997 WL 805271 at *3 (E.D.Pa. Dec. 30, 1997) (citing AM/PM Franchise Ass'n v. Atlantic Richfield Co., 584 A.2d 915, 921 (Pa.1990)). In showing that damages can be calculated with certainty, "[p]roof of damages need not be mathematically precise, but the evidence must establish the fact 'with a fair degree of probability.'" Advent Systems, 925 F.2d at 680 (citation omitted).

Bullen claims there is no evidence to support Leather Pro's damages claims, no evidence that Leather Pro's lost business opportunity with Stanley Steemer was the proximate consequence of Bullen's alleged breach of contract, and no evidence that Leather Pro's lost opportunity with Stanley Steemer was reasonably foreseeable to Bullen. In support of its claim for incidental and consequential damages flowing from

Bullen's breach of its contract, Leather Pro relies on the testimony of An Vu, Stanley Steemer's purchasing agent, and on an expert damages report from Michael Molder.

### 1.  An Vu Testimony

An Vu, Stanley Steemer's purchasing agent at the time it began negotiations with Leather Pro for leather cleaning products, testified concerning Stanley Steemer's relationship with Leather Pro.  He explained that when Stanley Steemer decided to expand its services to include leather cleaning products, it considered two companies to provide the service and ultimately decided on Leather Pro.  As a result, Mr. Vu called Mr. McDonald of Leather Pro "to see if he would be willing to private label our product for Stanley Steemer and to provide us with the chemicals."  Vu. Dep. 13:25–14:3.  Under the agreement ultimately reached, Leather Pro would provide both leather cleaning chemical products and kits, and would train Stanley Steemer employees and franchisees in use of the products and kits.  See id. at 14:12–15:11.  These services were to be provided "hand in hand."  Id. at 14:25.  Mr. Vu further explained that as Leather Pro trained Stanley Steemer employees, Stanley Steemer was buying and stocking the Leather Pro products.  See id. at 14:25–15:5.  Mr. Vu specifically stated that, as part of a national rollout of its enhanced leather cleaning business, Stanley Steemer "intended to have all [its] technicians in the branch system trained" and that there were approximately 50–55 Stanley Steemer branches at the time the training began.  Id. at 15:6–22.  Mr. Vu was unaware what Leather Pro charged for each session in which it trained Stanley Steemer

employees, but he testified that when Stanley Steemer began to stock Leather Pro's leather cleaning products in its trucks in 2007, it purchased $190,000 worth of leather care products.  Id. at 15:16–16:7; 18:19–24.  Mr. Vu also testified that, in 2007, Stanley Steemer bought 288 leather cleaning kits, and had decided to purchase leather cleaning kits for every Stanley Steemer truck.  See id. at 19:16–25.

In response to questions about the recall of the products and its effect on Stanley Steemer's relationship with Leather Pro, Mr. Vu answered, "[b]asically, I asked [Mr. McDonald] going forward what's going to happen to this - your business with Bullen?  I can't - I basically told [Mr. McDonald] I couldn't trust Bullen.  I left it at that."  Vu Dep. 28:23–29:1.  In discussing Stanley Steemer's actions following its discovery that the products were not suitable for use, Mr. Vu testified that he contacted another supplier "during the recall process" because "we made the decision that, hey, we need to find another supplier.  We need to go a different direction, and we made a phone call."  Id. at 66:18–22.

## 2.    Expert Report of Michael Molder

### a.    Incidental Damages, i.e. Out of Pocket Costs

Mr. Molder sets forth the basis for Leather Pro's claimed incidental damages of $94,283 in his report.  He explains that Leather Pro seeks $8,736 for the cost of the protection product it returned to Bullen and which Bullen refused to refund; $84,088 for the replacement cost of the protection product Leather Pro purchased from Multi-Master;

and $1,459 Bullen charged it to bottle the protection products purchased from Multi-Master. Molder Report, 5–6. Although Bullen claims Leather Pro's "incidental and consequential damages are overly remote," it does not explain further how Mr. Molder's calculation of Leather Pro's incidental damages is problematic beyond this blanket statement. The remainder of its brief addresses whether Leather Pro has presented evidence sufficient to support its claim for lost profits. Bullen provides no evidence that this calculation is inaccurate or that it includes costs unforeseeable to Bullen.

### b.    Lost Profits from Discontinued Training Program - Training Sessions

Based on the testimony of Mr. Vu and Leather Pro's records from the training programs, Mr. Molder estimated $77,400 in lost profits as a result of the cancelled training program of Stanley Steemer employees and franchisees. By the time the recall of Bullen-produced products began in late March of 2007, forcing cessation of the training programs, Leather Pro had conducted training at 73 of the approximately 310 Stanley Steemer facilities. See Molder Report, 7. Based on a lost profit calculation of $2,580.14 per training program, Mr. Molder calculated loss of profits from discontinuation of the training program at $77,400 (lost profit of $2,580.14 per training program times 30, which represents the remaining franchises/branches that would have been trained to complete the national rollout of the program[6]). Molder Report, 7.

---

[6] 320 minus 73 equals 247. Stanley Steemer had approximately 320 facilities that required training, and training had only been conducted at 73 of those facilities. Mr. Molder multiplied the profits lost per training session by 30 and not by 247. Although I can find no

### c. Lost Profits from Discontinued Training Program - Leather Cleaning Kits

Mr. Molder also calculated profits lost as a result of the terminated supply relationship between Leather Pro and Stanley Steemer. He estimates that, based on the number of leather cleaning kits purchased by Stanley Steemer in connection with the 73 training programs that took place prior to the recall (288 kits), it would have required an additional 681 cleaning kits to equip the remaining 247 Stanley Steemer outlets had the rollout been completed. Molder Report, 8. Information from Mr. McDonald indicated that Leather Pro made a profit of $161.28 per kit. Id. Mr. Molder therefore calculated lost profits on the kits as 680 kits times $161.28 in profits per kit, equaling $109,670.40. Id. at 9.

Mr. Molder adds to his estimate for lost profits on the kits the amount Leather Pro would have received from "annual replacement kit purchases." Id. Stanley Steemer purchased 25 leather cleaning kits (presumably from another vendor) in 2009. Based on this fact and assuming that Leather Pro's relationship with Stanley Steemer would have continued from 2008 through 2010, Mr. Molder estimates that Stanley Steemer would have bought 25 replacement kits *from Leather Pro* each year from 2008 to 2010 and therefore includes the profits lost from the sale of 75 replacement kits in his total lost

---

explanation for this discrepancy in his report, Mr. Vu does mention in his deposition that the training programs took place in "a centralized location where four or five states [or] cities, can go to one location and get trained." Vu Dep. 15:18–22. I assume that the estimate of 30 additional training sessions is based on a continuation of this centralized location training.

profit estimate on the kits.  Id.  Adding the profits lost from these 75 kits to the

$109,670.40 lost from kits that would have been sold during the remainder of the rollout

in 2007, Mr. Molder reaches an amount of $121,928.  Id.

### d. Lost Profits from Terminated Supply Program - Chemicals

Finally, Mr. Molder claims Leather Pro lost sales, and therefore profits, because

"Stanley Steemer needed to purchase sufficient quantities of chemicals to complete the

nation-wide rollout of the enhanced leather cleaning services and, thereafter, purchase

materials on a replacement basis."  Molder Report, 8.  The first part of this statement is

consistent with An Vu's testimony that Stanley Steemer purchased leather cleaning and

protection chemicals from Leather Pro *separate from* the leather cleaning kits themselves.

As he did with respect to the leather cleaning kits, Mr. Molder calculates the amount of

chemical product Stanley Steemer would have needed to complete the rollout by looking

to Stanley Steemer's chemical purchases prior to the recall.  See Molder Report, 10.  And

as he did with his estimate for replacement kits, Mr. Molder used Stanley Steemer's

actual chemical purchase amounts from 2009 to estimate the chemicals that would have

been purchased on a replacement basis from 2008 through 2010.  To calculate damages

from loss of chemical sales, Mr. Molder separates out each chemical product, and, per

product, adds together the chemical purchase units that would have been required to

complete the rollout and the replacement units he estimates Stanley Steemer would have

purchased from 2008 through 2010, and multiplies the total purchase unit number by lost

profits per unit.

The total profits lost solely from chemical products that would have been sold to complete the rollout is not calculated by Mr. Molder, because he includes in his final damages calculation the amount of chemicals he claims Stanley Steemer would have purchased following completion of the rollout (the replacement sales). According to Mr. Molder's calculations, Leather Pro's total profits lost from chemical sales, including ongoing sales, is $421,955.11. Based on his figures, I estimate that he would calculate total profits lost from chemical sales *not* including replacement sales (i.e., only including the chemicals that would have been required to complete the rollout) at $208,817.26.

### 3. Leather Pro Has Demonstrated a Genuine Issue of Fact on Its Damages Claim

Bullen has not countered Mr. Molder's report with one of its own, and offers only generalized statements that Leather Pro has failed to present evidence in support of its damages claims. Therefore, I am left to examine the evidence myself to determine whether Leather Pro has proffered evidence which, at trial, will allow it to (1) establish its damages with reasonable certainty, (2) show that the damages were the proximate consequence of Bullen's breach, and (3) show that the damages were reasonably foreseeable to Bullen.

With respect to Leather Pro's claim for incidental damages, Bullen has made no coherent argument that Leather Pro's evidence cannot be submitted to a jury. Therefore, I will deny Bullen's motion for summary judgment on Leather Pro's reasonably calculated

and essentially unchallenged incidental damages claim for $94,283.

With respect to Leather Pro's claim for lost profits, Leather Pro has demonstrated that a genuine issue of fact exists. On the first prong, Mr. Molder's calculations are sufficient to establish Leather Pro's lost profits as a result of the halted rollout of Stanley Steemer's leather cleaning business. Mr. Molder looked to the number of Stanley Steemer technicians already trained under the agreement and how many were left to train and calculated Leather Pro's loss in training programs, kits, and chemicals for those kits accordingly. While I do not doubt that Mr. Molder's *calculation* of damages during the time after the rollout was valid, in that he used actual purchase data from Stanley Steemer in 2009 to calculate damages for the period from 2008-2010, whether damages from ongoing sales of Leather Pro's products were foreseeable to Bullen is another matter.

To meet the second prong, and show that its lost profits were the proximate result of Bullen's breach, Leather Pro cites the testimony of Mr. Vu, who stated during his deposition that it was during the recall process that Stanley Steemer began seeking a new supplier for its leather cleaning products. Bullen has presented no evidence from which a jury could infer that there was another cause for Stanley Steemer's decision to terminate its relationship with Leather Pro. Therefore, Leather Pro has demonstrated that a material issue of fact exists on this point.

Finally, Leather Pro must show that the lost profits it seeks were reasonably foreseeable to Bullen. Mr. Molder claims Leather Pro sustained lost profits first when the

rollout of Stanley Steemer's leather cleaning kits was halted by the recall, and then when

Stanley Steemer used other suppliers to provide replacement kits and chemical products.

There are two relevant foreseeability issues that must be addressed: first, whether Bullen,

as the provider *only* of chemical products, could have foreseen Leather Pro's lost profits

related to the training programs and the kits; and second, whether Bullen could have

foreseen profits lost from an ongoing supply relationship between Leather Pro and

Stanley Steemer for replacement chemicals.

Bullen has presented no evidence concerning the first foreseeability issue. It

claims generally that "there is no evidence that the lost business opportunity with Stanley

Steemer was reasonably foreseeable." Def.'s Mem, 17. Leather Pro responds that

"Bullen was aware that the Leather Pro private label leather cleaning and treatment

products were being resold to Stanley Steemer" because it "was responsible for producing

new labels for the Leather Pro products bearing the Stanley Steemer name" and it "had

been producing, shipping, and receiving payment for the Leather Pro products for several

months" prior to the recall. Pl.'s Resp., 25. Where the non-moving party bears the

burden of proof on a particular issue at trial, the moving party's burden can be met simply

by demonstrating "that there is an absence of evidence to support the non-moving party's

case." Celotex, 477 U.S. at 325. After the moving party has met this burden, "the

adverse party's response . . . must set forth specific facts showing that there is a genuine

issue for trial." FED. R. CIV. P. 56(e). Bullen has suggested there is no evidence that

Leather Pro's lost profits on the training program and leather cleaning kit sales were foreseeable to it.

While the evidence presented by Leather Pro is not substantial, it has demonstrated that Bullen knew its products were being created for ultimate use by Stanley Steemer. Bullen put a Stanley Steemer label on the products, shipped the products directly to Stanley Steemer, and received the recalled products back from Stanley Steemer. How much Bullen knew about the extent of Leather Pro's arrangement with Stanley Steemer, based on its shipments to and from it, and its creation of labels for Stanley Steemer, is a question of fact for the jury. If Bullen knew the products were part of a larger agreement to provide leather cleaning kits and train Stanley Steemer employees, lost profits relating to the kits and the training would have been foreseeable to Bullen.

As to the second foreseeability issue, Bullen claims "[there is] no evidence to suggest that the business relationship with Stanley Steemer would have continued past the initial phase." Def.'s Mem, 18. Because Bullen does not explain what it means by the term "initial phase," I will assume it is referring to the national rollout of Stanley Steemer's leather cleaning business. Bullen relies here on the testimony of An Vu, who stated that "[t]he business relationship between Stanley Steemer and Leather Pro was at all times terminable at the will of either Stanley Steemer or Leather Pro." Vu Dep. 72:24–73:3. Even if this is true, Leather Pro, in the context of proving the foreseeability of all its damages, should have the chance to present this claim to the jury. Due to the all-

inclusive nature of the agreement between Leather Pro and Stanley Steemer, and based on

Bullen's knowledge of this agreement, a jury could find that this claim for damages is

also valid.

In sum, the evidence presented by the parties establishes that Bullen had a

contractual obligation to produce chemical cleaning products for Leather Pro, and that it

knew Leather Pro was selling the products to Stanley Steemer.  Leather Pro has met its

burden on summary judgment for its incidental damages claim by providing an expert

report establishing that its incidental damages can be reasonably calculated and providing

evidence that it returned the contaminated cleaning products to Bullen and mitigated its

damages by finding another supplier for the nonconforming protection products.

With respect to Leather Pro's claim for consequential damages in the form of lost

profits, Mr. Molder's report easily demonstrates that damages resulting from the halt of

the rollout can be calculated to a reasonable certainty.  An Vu's testimony establishes that

the contamination of the Bullen-produced chemicals was the proximate cause of Stanley

Steemer ending its business relationship with Leather Pro.  Finally, Leather Pro has

established that an issue of fact remains whether the damages it seeks were reasonably

foreseeable to Bullen.  The evidence of record establishes that Bullen was aware that

Leather Pro and Stanley Steemer had an agreement for Leather Pro to provide services

and chemicals for Stanley Steemer, and the extent to which Bullen was aware of the

nature of that agreement and could foresee the damages that resulted from the breakdown

of that relationship is a matter for the jury.

**IV.	CONCLUSION**

For the reasons set forth above, I will grant Bullen's motion for summary judgment on Leather Pro's negligence claim and dismiss Count III of Leather Pro's complaint.  I will deny the motion on the remaining claims.  An appropriate order follows.